1   NICOLE ROTH (CAL. BAR NO. 244919)
    nroth@aldf.org
2   CARTER DILLARD (CAL. BAR NO. 20627)
    cdillard@aldf.org
3   JOHN MELIA (CAL. BAR NO. 278323)
    jmelia@aldf.org
4   ANIMAL LEGAL DEFENSE FUND
    170 East Cotati Avenue
5   Cotati, CA 94931

6   Telephone:    +1-707-795-2533
    Facsimile:    +1-707-795-7280
7
    Attorneys for Plaintiffs
8

9                   UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12

13  ANIMAL LEGAL DEFENSE FUND, a          Case No.  12-05809 WHA
    non-profit corporation; REGAL VEGAN,
14  INC.,                                 **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES IN OPPOSITION TO**
15              Plaintiffs,               **DEFENDANTS' MOTION TO**
                                          **DISMISS**
16         v.
                                          Date:      April 4, 2013
17  HVFG, L.L.C. (d/b/a "Hudson Valley Foie   Time:      11:00 a.m.
    Gras"), Marcus Henley, Michael Ginor, Izzy   Place:     Courtroom 8
18  Yanay, and Richard Bishop,

19              Defendants.               **ORAL ARGUMENT REQUESTED**

20

21

22

23

24

25

26

27

28

1

TABLE OF CONTENTS

2 INTRODUCTION ................................................................................1

3 STATEMENT OF ISSUES TO BE DECIDED .....................................................3

4 STATEMENT OF FACTS ................................................................................3

5    Defendants................................................................................ 3

   Regal Vegan ............................................................................... 3

6       Regal Vegan's Injuries.................................................... 4

7    Animal Legal Defense Fund ......................................................... 6

8       ALDF's Injuries ................................................................ 6

9 ARGUMENT ................................................................................7

10   I.   While the Court may look at extrinsic evidence while considering 12(b)(1) motion to dismiss, the Court must accept the allegations in the complaint and construe them favorably

11 towards Plaintiffs................................................................................ 7

12   II.  Both Plaintiffs have pleaded sufficient injury in fact, causation, and redressability to support Article III standing. ......................................................... 7

13

14     A.  Both Plaintiffs have suffered injury in fact as a result of Defendants' false advertising...... 8

15       1.   Diversion of ALDF's organizational resources and frustration of its mission constitute injury in fact for Article III standing. ...................................... 8

16       2.   Regal Vegan and Defendants both target customers seeking a humanely produced, spreadable paté, and a Plaintiffs show a reasonable chain of inferences that Defendants' false

17 advertising has hurt Regal Vegan in this national market. Evidence of actual loss of sales is

18 not required. ................................................................................ 10

19     B.  Plaintiffs' injuries are fairly traceable to Defendants' false advertising............................. 14

20     C.  A court order enjoining Defendants from calling their force-fed foie gras "humane" would redress Plaintiffs' injuries sufficiently for Article III standing. ................................................. 16

21   III.   A finding of Article III standing for either Plaintiff is sufficient to deny Defendants'

22 motion to dismiss for both Plaintiffs. ......................................................... 17

23   IV.   Pursuant to the Court's standing order, Plaintiffs request oral argument by an attorney with fewer than four years of experience. ................................................................. 18

24 CONCLUSION ................................................................................18

25

26

27

28

TABLE OF AUTHORITIES

**CASES**

*Carey v. Population Services Int'l*, 431 U.S. 678 (1977)............................................. 18

*Carrico v. City & County of San Francisco*, 656 F.3d 1002 (9th Cir. 2011)................................ 8

*Fair Hous. of Marin v. Combs*, 285 F.3d 899, 903 (9th Cir. 2002) ................................ 9, 10, 16

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................ 9, 15

*Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ................................ 18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)............................................. 8, 15

*Massachusetts v. EPA*, 549 U.S. 497 (2007).......................................................... 16, 17

*Mutation Mink Breeders Asso. v. Lou Nierenberg Corp.*, 23 F.R.D. 155 (S.D.N.Y. 1959) ....................................................................................................... 13

*Orsay v. United States Dept. of Justice*, 289 F.3d 1125 (9th Cir. 2002)....................................... 7

*Preminger v. Peake*, 536 F.3d 1000 (9th Cir. 2008) ...................................... 8

*S. Cal. Hous. Rights Ctr. v. Ass'n & Los Feliz Towers Homeowners Ass'n Bd. of Dirs.*, 426 F. Supp. 2d 1061 (C.D. Cal. 2005) ................................ 10

*See Cetacean Cmty. v. Bush,* 386 F.3d 1169 (9th Cir. 2004).................................... 7

*Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26 (1976) .................................. 15

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011) ........................ 11, 12, 13

*United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669 (1973) .................................................................................................. 8

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003) ................................ 7

**RULES**

Federal Rule of Civil Procedure 12(b)………………………………………………..*passim*

**ARTICLES**

Carter Dillard, *False Advertising, Animals, and Ethical Consumption*, 10 Animal L. 25 (2004)……………………………………………………………………………………10,11

**PENDING CASES**

*Association Des Éleveurs De Canards Et D'oies Du Québec v. Harris*, No. 2:2012cv05735 (C.D. Cal. filed July 2, 2012)………………………………………………………………………….2

**INTRODUCTION**

This action arises from Defendants' prominently advertising in California their foie gras product as "the Humane Choice" when it is literally illegal to sell that product in California because the sale itself violates the state's animal cruelty law, and when California considers this "humane" product to be so cruel that it cannot be lawfully produced here. The Defendants' sham advertising constitutes an intentional effort to mislead consumers launched even after Defendants' failed to obtain a legitimate humane certification.  The action is brought by a competitor, whose clients have specifically switched from Defendants' product to her product as a replacement, whose product has almost the identical name ("Faux Gras") to that of the Defendants' product ("Foie Gras"), and whose product is prominently marketed as a specific alternative to the Defendants' product, but unlike their product is not banned as illegally cruel. Joining this competitor is a charitable organization, relying on recent precedent, that has spent significant amounts of money trying to educate consumers regarding violations of animal cruelty law by the Defendants, but whose efforts are being constantly undone and who is therefore being harmed by the Defendants' prominent sham advertising campaign.

Foie gras is produced by intentionally force-feeding ducks or geese to induce a liver disease that distends the animals' livers eight or more times their normal size, which causes the animals pain and assorted serious illnesses, and creates a condition whereby the animals are slowly and painfully dying of liver failure before they are even killed. The State of California and more than a dozen countries have banned the practice of force-feeding birds to produce foie gras because it is cruel. In Israel, formerly one of the world's largest producers of foie gras, the Supreme Court determined that foie gras production violated the nation's animal cruelty law. Compl. at ¶ 1.

Defendants bring a motion to dismiss the present action under Federal Rule of Civil Procedure 12(b)(1), arguing the Court lacks subject matter jurisdiction to hear the case because Plaintiffs lack Article III standing. MTD p. 2-3. The filing, while defending Defendants' description of their product at humane, never once addresses the fact that force-fed foie gras is

1    illegal to produce or sell in this Court's jurisdiction. Neither does it acknowledge that, almost

2    eight months since California's ban went into effect, HVFG's efforts to challenge the law have

3    failed to yield results. *See generally Association Des Éleveurs De Canards Et D'oies Du Québec*

4    *v. Harris*, No. 2:2012cv05735 (C.D. Cal. filed July 2, 2012).

5        Well-respected avian experts agree that force-fed foie gras production can never be

6    humane. Compl. at ¶ 1.  Common injuries from the force-feeding process include bacterial

7    infection, fungal growth, pneumonia, bone fractures, crop impaction, ruptured esophagi,

8    granulomas, aspiration, trauma, abrasions, perforations, and stress. *Id.* at ¶ 61. The enlarged livers

9    lead to numerous ailments and disease such as hepatic lipodosis, septicemia, respiratory distress,

10   toxemia, inflammation, neurological damage, ruptured liver, liver failure, hypoglycemic coma,

11   skin diseases, encephalopathy, bursitis, seizures, diarrhea, depression, loss of appetite, swollen

12   feet, lameness, obesity, and bowel obstruction. *Id.* at ¶ 64. Many of these conditions can be quite

13   painful for the ducks, and at the very least, are abnormal and indicate the ducks are experiencing

14   an inhumane level of welfare involving a severe and debilitating illness. *Id.*

15       The Plaintiffs in this case are the Animal Legal Defense Fund (ALDF) and Regal Vegan.

16   ALDF is a national non-profit dedicated to the use of the legal system to assist courts and

17   legislatures in preventing animal cruelty and advancing the interests of animals.  *Id.* at ¶ 11. Regal

18   Vegan is a New York business that sells a vegan paté called Faux Gras. *Id.* at ¶ 10. Based on the

19   false and misleading nature of Defendants' use of the word humane to describe their products,

20   Plaintiffs have sued Defendants for false advertising under federal and California law.

21       Plaintiffs in fact have suffered substantial injury as a result of Defendants' false

22   advertising. ALDF has had to divert resources from other activities in order to respond to

23   Defendants' misrepresentations, frustrating ALDF's organizational mission. Compl. at ¶¶ 116-

24   118. Regal Vegan, for its part, has likely lost sales to Defendants from customers who buy foie

25   gras thinking that it is a humanely produced product. *Id.* at ¶¶ 114-15. These injuries, which are

26   directly traceable to actions by Defendants, would be alleviated by the relief requested in the

27   complaint, most significantly a court order preventing the use of the word "humane" in

28   Defendants' advertising.

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

1   Plaintiffs have pled ample facts to support Article III standing, and Defendants' Motion to

2   Dismiss should therefore be denied.

3   ### STATEMENT OF ISSUES TO BE DECIDED

4   1)  Should Plaintiffs' lawsuit be dismissed for lack of subject-matter jurisdiction, as requested

5   by Defendants, where each Plaintiff satisfies every element Article III standing?

6   ### STATEMENT OF FACTS

7   **Defendants**

8   Defendant HVFG LLC (d/b/a Hudson Valley Foie Gras) is a grower of Moulard ducks

9   and producer of duck products located in Ferndale, NY. *Id*. at ¶ 12. Individual Defendants are

10  owners, officers, and managers of HVFG who are responsible for developing or implementing the

11  company's "the Humane Choice" advertising campaign. *See id*. at ¶¶ 26-34. HVFG was formed

12  in 1989 and has advertised itself as humane since 2008. *Id*. at ¶ 12. The ducks are grown, force-

13  fed, processed, and packaged on site, and are shipped directly to consumers via HVFG's website.

14  *Id*. HVFG is the largest producer of foie gras in the United States. *Id*.  It sells to all states in the

15  country. *Id*.

16  Force-fed ducks suffer from numerous infections and ailments related to force-feeding and

17  resulting liver diseases. *Id*. at ¶ 58.  Some of these problems result from injuries sustained during

18  the feeding process. *Id*. Most problems, however, are the result of the ducks' liver growth and

19  resulting disease. *Id*. Avian experts have concluded that many of the conditions resulting from the

20  force-feeding process, as well as related diseases, are painful for the ducks. *Id*. at ¶ 59. These

21  experts conclude, as a result, that foie gras production is cruel and inhumane. *Id*. at ¶ 60.

22  **Regal Vegan**

23  Plaintiff Regal Vegan is a business headquartered in Brooklyn, New York, that produces

24  and sells the food product Faux Gras and as such is competing with Defendants. *Id*. at ¶ 10. Faux

25  Gras is made from all natural, whole food, plant-based ingredients. *Id*.  Faux Gras does not

26  contain or use any animal products in its production. Regal Vegan's customers purchase Faux

27  Gras as a humane alternative to force-fed foie gras. *Id*. While Faux Gras appeals to a wide variety

28

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

1    of customers, Regal Vegan's advertising makes several direct comparisons between Faux Gras

2    and foie gras. The company's website includes a testimonial from the famous actress Alicia

3    Silverstone referring to Faux Gras as "vegan foie gras." Decl. Michael Tenenbaum Ex. C. On

4    another part of the website, Regal Vegan describes Faux Gras as "more nutritious and a far cry

5    from the cruelty of its namesake, Foie Gras." Decl. Michael Tenenbaum Ex. B. Regal Vegan also

6    sells a small line of merchandise featuring "Peace Geese," or illustrations of geese with hands

7    shaped in peace signs in place of normal goose heads. Decl. John Melia Ex. A. Under this

8    illustration is the slogan "Tastes Great, Less Killing," an obvious comparison between the cruelty

9    of foie gas production and the humane nature of Faux Gras. *See id.*

10   **Regal Vegan's Injuries**

11          Regal Vegan sells Faux Gras directly to consumers through its website, including sales to

12   California. Regal Vegan would like to sell more of its product nationwide, including to

13   California. Compl. at ¶ 4. Since one of the main reasons people buy Faux Gras is that it is

14   humane, Regal Vegan is not able to compete as well in the marketplace due to Defendants' false

15   and misleading advertising and anti-competitive behavior. *Id.*

16          Plaintiffs' complaint includes reference to an abundance of surveys showing that

17   consumers value humanely produced foods and they will turn to meat analogs such as Regal

18   Vegan's Faux Gras to replace animal products when those products are not humanely produced:

19          1)  According to a 2012 consumer research study by the Humane Research Council, 74

20              percent of respondents said that the welfare and protection of animals raised for food

21              was "very important" or "somewhat important." *Id.* at ¶ 123.

22          2)  According to a 2010 consumer research study by the Humane Research Council, 50

23              percent of respondents said that animal care is important when deciding which food,

24              brands, and shops to select; 69 percent of respondents were willing to pay more for

25              higher ethical standards; 44 percent of respondents stopped buying a brand because

26              they learned the company was acting in a socially irresponsible or unethical way; and

27              42 percent of consumers are more loyal to ethically-produced food brands than other

28              brands. *Id.* at ¶ 124.

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

3) According to a 2007 Oklahoma State University national survey, 95 percent of consumers agreed with the statement, "it is important that farm animals are well cared for." *Id*. at ¶ 125.

4) "Humane" was the top-ranked standard among consumers when asked to choose among products that were identical in all other respects, over "Locally Grown," "Living Wage," "US Grown," and "Small-scale." *Id*. at ¶ 126.

5) Consumers are willing to pay more for food that they believe is humane.  Forty-four percent of Americans stated they would pay five percent more for humanely raised food, 20 percent would by up to 10 percent more.  *Id*. at ¶ 127.

6) According to a 2007 consumer research study by the Humane Research Council, nine percent of meat-eater survey respondents reported that reducing the suffering of animals on farms contributed to them reducing meat consumption.  *Id*. at ¶ 128.

7) Eighteen percent of consumers surveyed that had reduced their meat consumption cited concern for animal suffering as one of their considerations for changing their diet. *Id*. at ¶ 129.

8) According to the latest NPR-Truven Health Analytics Health Poll, among those who are eating less meat but not eliminating all meat from their diet, 30 percent were concerned with animal welfare. *Id*. at ¶ 130.

9) Consumers rely on external labeling of products in making their food purchasing decisions, particularly on representations about humane treatment and welfare from the producer. *Id*. at ¶ 133.

10) A consumer research study commissioned by the American Meat Institute found that fifty-one percent of American consumers reported having low knowledge of farmed animal care issues and practices. *Id*. at ¶ 135.

11) Meat alternatives, also known as "meat analogs" or "meat substitutes," have gained tremendous market share in the last decade and are increasing in availability and convenience in response to consumer demand.  Citing to a U.S. product database and a market research firm, NPR reported that "110 new meat substitute products were

introduced in 2010 and 2011" and "frozen meat substitute sales reached $267 million in 2011." *Id.* at ¶ 137.

12) A more recent article cites the sales in the United States for meat substitutes at $340 million, and growing at three to five percent per year. *Id.* at ¶ 138.

13) Almost half (46 percent) of meat-eaters that have reduced their red-meat intake have adopted meat substitutes into their diets. *Id.* at ¶ 140.

Defendants' false and misleading claim that its product is humane encourages consumers to purchase force-fed foie gras instead of Regal Vegan's cruelty-free product. *Id.* at ¶ 10. Regal Vegan is directly disadvantaged as a result of Defendants' advertising that it is "the Humane Choice." *Id.* The market for Faux Gras is adversely affected by the availability of force-fed foie gras. *Id.* In addition, Regal Vegan must invest resources educating consumers about the cruelty involved in force-fed foie gras. *Id.*

**Animal Legal Defense Fund**

Plaintiff ANIMAL LEGAL DEFENSE FUND (ALDF) is a national non-profit organization involved in every aspect of animal law. *Id.* at ¶ 11. ALDF has spent over three decades focusing on issues involving animals and the law; its focus is the use of the legal system to assist courts and legislatures in preventing animal cruelty and advancing the interests of animals. *Id.* ALDF has been involved in the protection of animals used and sold in commercial enterprises, with a focus on cruelty and intensive confinement of animals used for food. *Id.* ALDF has spent significant resources educating the public about the inhumane nature of foie gras production. *Id.*

**ALDF's Injuries**

Defendants' false advertising has harmed ALDF by drawing organizational resources away from other activities, and by frustrating ALDF's organizational mission. ALDF has taken the following steps to respond to Defendants' claims that their products are humane:

1) ALDF has expended substantial organizational resources to educate the public about the animal welfare and health consequences of factory farming, including foie gras production. *Id.* at ¶ 5.

2)   ALDF's communications department has spent significant resources raising awareness about the poor living conditions for ducks being raised for foie gras.

3)   ALDF has drafted press releases and has initiated letter-writing campaigns to oppose force-feeding of ducks raised for foie gras. *Id.*

4)   The organization has also spent extensive time and resources gathering information about foie gras production through public records requests to federal and state authorities. *Id.*

5)   ALDF has written letters to the California Attorney General and the Better Business Bureau asking for false advertising actions against foie gras producers who claim their products are humane. *Id.*

Each of these activities has injured ALDF by consuming organizational resources that could have been spent on other projects and outreach campaigns. *Id.*  Were Defendants to stop describing their product as humane, ALDF would be able to redirect its resources in the furtherance of other aspects of its mission.  *See id*.

## ARGUMENT

**I.       While the Court may look at extrinsic evidence while considering 12(b)(1) motion to dismiss, the Court must accept the allegations in the complaint and construe them favorably towards Plaintiffs.**

A defendant may bring a challenge to a plaintiff's Article III standing under FRCP 12(b)(1). *See Cetacean Cmty. v. Bush,* 386 F.3d 1169, 1174 (9th Cir. 2004). Unlike a 12(b)(6) motion to dismiss, "a court may look beyond the complaint and consider extrinsic evidence" when considering a motion under 12(b)(1). *Warren v. Fox Family Worldwide, Inc*., 328 F.3d 1136, 1141 (9th Cir. 2003). The nature of a 12(b)(1) dismissal "requires [the court] to accept all allegations of fact as true and construe them in the light most favorable to the plaintiffs." *Warren* 328 F.3d at 1139; *see also Orsay v. United States Dept. of Justice*, 289 F.3d 1125, 1127 (9th Cir. 2002).

**II.      Both Plaintiffs have pleaded sufficient injury in fact, causation, and redressability to support Article III standing.**

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

1    To establish "the irreducible constitutional minimum of standing," a plaintiff invoking

2  federal jurisdiction must establish "injury in fact, causation, and a likelihood that a favorable

3  decision will redress the plaintiff's alleged injury." *Carrico v. City & County of San Francisco*,

4  656 F.3d 1002, 1005 (9th Cir. Cal. 2011); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555,

5  560-61 (1992). Having clearly alleged injury in fact, causation, and redressability in the

6  complaint, Plaintiffs ALDF and Regal Vegan have sufficiently pled Article III standing.

7    **A.  Both Plaintiffs have suffered injury in fact as a result of Defendants' false**

8      **advertising.**

9    ALDF's diversion of organizational resources to address HVFG's misrepresentations and

10  the frustration of ALDF's mission are well-established forms of injury for Article III standing.

11  Likewise, Regal Vegan's has alleged a reasonable chain of inferences to showing how

12  Defendants' false advertising hurts its business, giving it standing under Article III.

13    In order to show injury in fact, a plaintiff must prove an injury that is (a) "concrete and

14  particularized," and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Lujan*, 504 U.S.

15  at 560. Injury is particularized if it has affected the plaintiff in a "personal and individualized

16  way." *Id.* at 561 n. 1. "The injury may be minimal" to show Article III standing. *Preminger v.

17  Peake*, 536 F.3d 1000, 1005 (9th Cir. 2008). An "identifiable trifle is enough for standing."

18  *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 734 n. 14

19  (1973). The effects of Defendants' false advertising go far beyond the requisite minimal trifles,

20  and in fact are substantial setbacks to each Plaintiff's interests.

21    **1.  Diversion of ALDF's organizational resources and frustration of its mission**

22      **constitute injury in fact for Article III standing.**

23    Responding to Defendants' misrepresentations has caused ALDF to divert resources from

24  other organizational activities and frustrated the organization's mission, constituting injury in fact

25  for standing. "[O]rganizations are entitled to sue on their own behalf for injuries they have

26  sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n. 19 (1982). When assessing

27  injury in fact to a non-profit organization, "concrete and demonstrable injury to the organization's

28  activities --with the consequent drain on the organization's resources --constitutes far more than

1   simply a setback to the organization's abstract social interests." *Fair Hous. of Marin v. Combs*,

2   285 F.3d 899, 903 (9th Cir. 2002). An organization sustains a cognizable injury when a

3   defendant's actions cause a "diversion of resources" that has "frustrated the organization's"

4   objectives. *See id.*

5         The 9th Circuit's *Fair Housing* explains that injuries like those suffered by ALDF in the

6   present case are enough to support standing. In *Fair Housing*, a non-profit organization sued the

7   owner of an apartment complex for illegal housing discrimination on the basis of race. *Id.* at 902.

8   To further its mission of "promoting equal housing opportunities," the plaintiff organization

9   "investigate[d] allegations of discrimination, conduct[ed] tests of housing facilities to determine

10   whether equal opportunity in housing is provided, [took] such steps as it deem[ed] necessary to

11   assure equal opportunity in housing and to counteract and eliminate unlawful discriminatory

12   housing practices, and provide[d] outreach and education to the community regarding fair

13   housing." *Id.* When the organization received complaints that defendant was discriminating

14   against minority tenants, it conducted an investigation to confirm the reports, diverting resources

15   away from its other activities. *Id.*

16         The court held that these financial damages to the plaintiff organization were sufficient to

17   support standing. *Id.* at 905. The fact that "resources were diverted to investigating and other

18   efforts to counteract [defendant's] discrimination" constituted injury in fact to the Plaintiff. *Id.*

19   Moreover, the court recognized "frustration of mission damages, namely for design, printing, and

20   dissemination of literature aimed at redressing the impact [defendant's] discrimination had on the

21   Marin housing market." *Id.*

22         The kind of organizational injury that ALDF is alleging is analogous to that of the plaintiff

23   in *Fair Housing*. While ALDF has "spent significant resources educating the public about the

24   inhumane nature of foie gras production," ALDF's mission is much broader than that, and the

25   organization must allocate its scarce resources among a large number of animal-related causes

26   and projects. Compl. at ¶ 11. Similarly, the *Fair Housing* plaintiffs were concerned with a broad

27   range of housing discrimination, not merely addressing the particular discrimination present in the

28   defendant's apartment complex. *See Fair Hous. of Marin*, 285 F.3d at 903. Here, as in *Fair*

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

*Housing*, the plaintiff organization has been forced to investigate and address the unlawful of activities of the Defendants, preventing Plaintiffs from pursuing other organizational activities. Moreover, ALDF and Fair Housing of Marin both spent resources on the "dissemination of literature aimed at redressing the impact" of their respective defendants' actions, which the Ninth Circuit recognized as "frustration of mission damages." ALDF's vigorous opposition to foie gras is not, as Defendants suggest, mere "voluntary activities." MTD at 6. They are necessary responses to Defendants' misrepresentations, and fall squarely into the *Fair Housing* category of injury in fact.

In an attempt to dissuade the Court from applying the organizational standing doctrine explained above, Defendants cite a law review article by Carter Dillard, one of the attorneys for Plaintiffs, in which he suggests that an animal advocacy organization does not have standing to sue in a federal false advertising case. MTD at pp. 2, 9. In the years since this law review article was written, both case law on organizations standing and Mr. Dillard's legal opinions have developed and changed significantly. *See e.g., S. Cal. Hous. Rights Ctr. v. Ass'n & Los Feliz Towers Homeowners Ass'n Bd. of Dirs.*, 426 F. Supp. 2d 1061,1068-9 (C.D. Cal. 2005) (extending *Fair Housing of Marin*-type organizational standing to a non-profit in a state false advertising lawsuit). Should the Court recognize this article as persuasive, as Defendants seem to suggest, Mr. Dillard also explains that "humane foie-gras" is an example of per se false advertising that "must be stopped." Carter Dillard, *False Advertising, Animals, and Ethical Consumption*, 10 Animal L. 25, 32 (2004). Rather than cherry picking phrases out of a nine-year-old law review article, however, Plaintiffs request that the Court apply case law, under which ALDF has clearly pleaded Article III injury in fact.

### 2. Regal Vegan and Defendants both target customers seeking a humanely produced, spreadable paté, and a Plaintiffs show a reasonable chain of inferences that Defendants' false advertising has hurt Regal Vegan in this national market. Evidence of actual loss of sales is not required.

Regal Vegan has alleged facts allowing for a reasonable chain of inferences demonstrating that Defendants' false advertising hurts Regal Vegan's business in the national market for

1    humane paté. In this way, Regal Vegan has sufficiently pled Article III injury in fact.

2          As a general rule, a plaintiff in a false advertising case, such as Regal Vegan, may

3    establish Article III standing by showing that "'some consumers who bought the defendant['s]

4    product under [a] mistaken belief' fostered by the defendant 'would have otherwise bought the

5    plaintiff['s] product.'"  *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir.

6    2011).[1] "A plaintiff who can't produce lost sales data may . . . establish an injury by creating a

7    chain of inferences showing how defendant's false advertising could harm plaintiff's business." *Id.*

8    Although Defendants make a point to note that Regal Vegan has not alleged actual evidence of

9    loss of "any sales to Hudson Valley over the past three to four years," only "inferences" showing

10   "harm to plaintiff's business" is required. MTD at p. 10; *See TrafficSchool.com,* 653 F.3d at 825.

11         The Ninth Circuit recently found injury in fact proven by such a chain of inferences in

12   *TrafficSchool.com. TrafficSchool.com,* 653 F.3d at 825. This case concerned two online traffic

13   schools and drivers' education providers suing the operators of DMV.org for misleading

14   customers into thinking that the defendant's website was government-affiliated. *Id.* at 824.

15   Among the evidence provided by plaintiff competitors was a consumer survey showing that "a

16   'recommended by DMV' endorsement is an important factor in consumers' choice of traffic

17   schools." *Id.* at 826. The court found standing for the plaintiffs, reasoning that defendant would

18   "capture a larger share of the referral market . . . if they mislead consumers into believing that

19   DMV.org's referrals are recommended by their state's DMV." *Id.*

20         While Regal Vegan has not produced, and need not produce, lost sales data at this stage in

21   the litigation, it does put forward a "reasonable chain of inferences" demonstrating that

22   Defendants' misrepresentations hurt its ability to compete in the market for humanely produced

23   spreads.  Like the plaintiff in *Trafficschool.com*, who presented surveys showing that consumers

24   preferred government-endorsed drivers' education services, Regal Vegan points to surveys that

25   consumers prefer the very kind of humane products that Defendants falsely purport to produce.

26   _____

[1] Defendants seems to contend that because Plaintiffs have brought a false advertising cause of
27   action, the standards for Article III standing change to require that consumers buy defendants'
     product instead of plaintiffs' based on a misrepresentation. This is a misinterpretation of the law.
28   *Trafficschool.com* suggests this type of showing as a possible way to establish Article III
     standing, but does not require it.

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

1    *See TrafficSchool.com, Inc.*, 653 F.3d at 825; Compl. at ¶¶ 123-130.

2          "According to a 2010 consumer research study by the Humane Research Council, 50

3    percent of respondents said that animal care is important when deciding which food, brands, and

4    shops to select; 69 percent of respondents were willing to pay more for higher ethical standards;

5    44 percent of respondents stopped buying a brand because they learned the company was acting

6    in a socially irresponsible or unethical way; and 42 percent of consumers are more loyal to

7    ethically-produced food brands than other brands." *Id*. at ¶ 124. In another study, "'Humane' was

8    the top-ranked standard among consumers when asked to choose among products that were

9    identical in all other respects, over 'Locally Grown,' 'Living Wage,' 'US Grown,' and 'Small-

10   scale.'" *Id*. at ¶ 126. "Meat alternatives, also known as 'meat analogs,' or 'meat substitutes,' have

11   gained tremendous market share in the last decade and are increasing in availability and

12   convenience in response to consumer demand." *Id*. at ¶ 137. Finally, surveys show that "[a]lmost

13   half (46 percent) of meat-eaters that have reduced their red-meat intake have adopted meat

14   substitutes into their diet." *Id*. at ¶ 140.

15         Just as surveys in *Trafficschool.com* showed that customers prefer DMV-endorsed driving

16   courses, the surveys in the complaint describe a market in which consumers prefer humanely

17   produced food. *See TrafficSchool.com, Inc.*, 653 F.3d at 825-26; Compl. at ¶¶ 123-130.

18   Moreover, with consumers replacing their meat consumption with meat analogs, it is a reasonable

19   inference that a foie gras eater would consider or purchase a vegan analog to Defendants' foie

20   gras. *See* Compl. at ¶¶ 137-141. Because only Plaintiff's product is in fact humane, however, it is

21   likely that Defendants are selling to consumers who, if they knew the truth, would buy Regal

22   Vegan's cruelty-free product. These kinds of known consumer preferences, and extrapolations of

23   likely consumer behavior, were enough to support standing in *Trafficschool.com*, and similarly

24   constitute injury in fact for Regal Vegan in the present case. *See TrafficSchool.com, Inc.*, 653

25   F.3d at 825-26. In this way, Regal Vegan can show a "reasonable chain of inferences" to

26   demonstrate how Defendants' false advertising harms its business.

27         Defendants claim that Plaintiff Regal Vegan's Faux Gras and Defendants' foie gras do not

28   compete because they do not contain the same ingredients and because they vary in price. The

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

1    fact is many products do compete despite these differences. *See e.g.*, *Mutation Mink Breeders*

2    *Asso. v. Lou Nierenberg Corp*., 23 F.R.D. 155, 158-9 (S.D.N.Y. 1959) (denying motion to

3    dismiss in unfair competition suit between genuine and faux mink garment producers where price

4    difference was as much as several thousand dollars). For example, a sparkling apple cider is in

5    many situations a substitute for the fine champagne to which Defendants compare their product.

6    While the cider is made from a different fruit and is significantly cheaper, consumers who are

7    avoiding alcohol for religious, medical, or social reasons may chose it as a substitute for a

8    sparkling wine. Similarly, consumers desiring a humane product can chose Regal Vegan's

9    cruelty-free paté as a substitute for force-fed foie gras.

10        Defendants harp on a single line of test that used to be present on Regal Vegan's website

11    stating that Faux Gras is "[n]ot meant to replace duck or goose liver," calling the quotation "fatal

12    to Plaintiffs' alleged standing." MTD at p. 11. Defendants obviously think they have found their

13    silver bullet in this phrase, but they conveniently fail to note the several other instances on Regal

14    Vegan's website that the company *does* compare its product to foie gras. Curiously enough, some

15    of these instances appear on the very exhibits that Defendants submit to argue that Regal Vegan

16    does not compete with foie gras. *See* Decl. Michael Tenenbaum Ex. B,C.  That Regal Vegan's

17    logo also features two "Peace Geese" and the phrase "Tastes Great, Less Killing," makes it clear

18    that Regal Vegan is marketing itself as a delicious, humane alternative to the famously inhumane

19    poultry product sold by Defendants. *See* Decl. John Melia Ex. A. All Defendants have shown is

20    that, at a time when the upcoming California foie gras ban was bringing the cruelty of the food to

21    the forefront of the mainstream media, Regal Vegan removed an instance of inconsistent

22    messaging from its website. Having substantially changed their own marketing in response to

23    consumer preferences and awareness, Defendants are hardly in a position to judge Regal Vegan

24    for its decision. Accounting for the growing market for humanely produced foods and meat

25    alternatives, as well as Regal Vegan's advertising as a whole, it would be surprising if

26    conscientious consumers were not considering Faux Gras as a substitute to force-fed foie gras.

27        Of all the terms Defendants could use to describe their product, moreover, their use of the

28    word "humane" is particularly significant and damaging. In a complaint by Animal Welfare

- 13 -

1  Institute against Perdue Farms Inc., the National Advertising Division of the Better Business

2  Bureau observed that "consumer perception and understanding of 'humane' treatment or 'raised

3  humanely' is directly relevant to the issue of whether such claims are substantiated or misleading

4  to consumers." Decl. John Melia Ex. C, p. 6. In another decision, the NAD noted that "claims of

5  'humane' treatment and representations made in advertising regarding the health of animals and

6  the development of husbandry practices represent are statements that are relied on by certain

7  consumers in making purchasing decisions regarding animal products." Decl. John Melia Ex. D,

8  p. 3. Because of the weight that consumers give to the word "humane" in their purchasing

9  decisions, misuse of the word is especially damaging to genuinely humane producers.

10      By using false and misleading advertising to target customers interested in humanely-

11 produced patés, Defendants capture customers who would be otherwise inclined to buy Regal

12 Vegan's cruelty-free product, injuring the Plaintiff's ability to compete in the national

13 marketplace.

14      **B.  Plaintiffs' injuries are fairly traceable to Defendants' false advertising.**

15      Defendants' false advertising has directly caused ALDF and Regal Vegan's injuries.  For

16 a plaintiff to show causation for Article III standing, "there must be a causal connection between

17 the injury and the conduct complained of -- the injury has to be 'fairly . . . trace[able] to the

18 challenged action of the defendant.'" *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky.*

19 *Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)).

20      Plaintiff ALDF's organizational purpose compels it to respond to misrepresentations, like

21 Defendants', about the humane treatment of animals. As ALDF alleges in the complaint, the

22 organization "has spent over three decades focusing on issues involving animals and the law; its

23 main focus is the use of the legal system to assist courts and legislatures in preventing animal

24 cruelty and advancing the protection of the interests of animals through the legal system." Compl.

25 at ¶ 11. ALDF could not advocate for more humane treatment of animals without directly

26 combatting misrepresentations, like Defendants', claiming that certain practices are humane. In

27 fact, educating the public about the inhumane treatment of farmed animals takes up a large part of

28 ALDF's resources.

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

1    Defendants erroneously argue that ALDF's injuries in responding to Defendants' false

2    advertising are an "optional expenditure of funds," not traceable to Defendants' conduct. MTD at

3    9, 12-13. ALDF, however, would not be spending these funds, but for Defendants'

4    misrepresentations. Failing to acknowledge this kind of causation between a defendant's unlawful

5    conduct and a plaintiff organization's actions to remedy the conduct would eviscerate the well-

6    established theory of Article III standing established by *Havens*, and further explained in *Fair*

7    *Housing*. *See Havens Realty Corp*, 455 U.S. at 378-79; *Fair Hous. of Marin*, 285 F.3d at 902-05.

8    Rather than investigating the defendant apartment complex in that case, or publishing literature

9    about racism in the local housing market, the plaintiff organization could have turned a blind eye

10   to defendant's discrimination. Doing so, however, would have been inconsistent with the

11   plaintiff's purpose for existence: to address housing discrimination in Marin County. *See Fair*

12   *Hous. of Marin*, 285 F.3d at 902. Similarly, ALDF's organizational purpose compels it to respond

13   to misrepresentations about farmed animals such as the ducks at Defendants' facility. By

14   persistently calling its product humane while using a force-feeding process that has been banned

15   in California and countries around the world because it is inhumane, Defendants compel ALDF to

16   assign resources to dispel myths about Defendants' practices.

17   Likewise, the competitive injury suffered by Regal Vegan is a direct result of Defendants'

18   misrepresentation about their products. Consumers are faced with numerous sources of

19   information stating that foie gras production is not humane. *See e.g.*, Compl. at ¶ 1. For one, the

20   State of California has banned the practice because it is per se inhumane. *Id*. On the other hand,

21   consumers then encounter Defendants' statements through its numerous multi-media sources

22   claiming its product is different than all of the other foie gras products. For example, Defendants'

23   website devotes an entire page to discussing the care of its animals, referencing "waterfowl

24   physiology" and "supporting research" claiming that its foie gras production is humane. Decl.

25   John Melia Ex. B.  Defendants' entire "the Humane Choice" marketing campaign tells customers

26   that if they care about humane production, they should choose Defendants' product. Consumers

27   rely upon this information, believing that Defendants' product really is different than other foie

28   gras products and that they are making a humane decision by purchasing Defendants' product.

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

*See id*; *see also* Compl. at ¶ 133. Were it not for Defendants' unfounded insistence that their product is humane, the many customers who care about humane food production would be more likely to buy Regal Vegan's cruelty-free spread. The resources Regal Vegan directs toward educating the public about the truth of foie gras are, moreover, not expended at the mere whim of the corporation, but are a necessary reaction to Defendants' false advertising and an attempt to minimize the effect of Defendants' misinformation on customers. *See id*. at ¶ 10. Regan Vegan would not suffer these injuries but for Defendants' false advertising.

### C.  A court order enjoining Defendants from calling their force-fed foie gras "humane" would redress Plaintiffs' injuries sufficiently for Article III standing.

In order to satisfy the redressability requirement of Article III standing, a plaintiff must show it is "likely that a favorable decision will redress [his] injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). A favorable decision must "relieve a discrete injury," but the plaintiff "need not show that a favorable decision will relieve his every injury." *Id*. at 525.  While Plaintiffs acknowledge that a favorable decision in this case will not entirely settle their qualms with the foie gras industry, such relief will alleviate the damage done by Defendants' misleading advertising campaign.

In *Massachusetts*, the Supreme Court recently clarified that plaintiffs could satisfy redressability even if a favorable ruling did not resolve their injuries entirely. *Id*. at 525-26 Plaintiffs in this suit were a coalition of governments and environmental organizations suing the Environmental Protection Agency for failing to properly regulate new motor vehicle emissions in light of risks posed by global warming. *Id* at 505. Among the issues in the case was whether the Court could redress the injuries that plaintiffs had alleged as a result of global warming. *Id*. at 525-26. While the Court acknowledged that regulating vehicle emissions would "not by itself *reverse* global warming," the Court did have jurisdiction to "decide whether EPA has a duty to take steps to slow or reduce it." *Id* at 525. The Court's ability to alleviate plaintiffs' injuries, if not entirely eliminate them, was enough to satisfy the redressability requirement of Article III standing. *See id*.

Though a favorable ruling from this Court will not entirely eliminate the conflict between

1    Plaintiffs and Defendants, it will alleviate Plaintiffs' injuries. Alleviation of injury is all that is

2    required by Article III standing. *See id*. Because ALDF will not be compelled to keep fighting

3    Defendants' misrepresentations that their product is humane, it will be better able to direct its

4    organizational resources to other vital aspects of its mission.

5           Similarly, just as the relief requested in *Massachusetts* would not entirely reverse the

6    effects of global warming, Regal Vegan acknowledges that the requested relief will not directly

7    silence all sources claiming that foie gras is humane. *See id*. Preventing Defendants' false

8    advertising will, however, do a great deal to reduce the injury to Regal Vegan. While the Court

9    cannot stop third parties from lying about the way that foie gras is produced, it does have the

10   authority to stop producers and sellers of this cruel product from misrepresenting foie gras as

11   humane. *See* MTD at 13-14. Given consumers' heavy reliance on packaging and advertising in

12   determining whether their food was humanely produced, it is especially important to prevent

13   those in Defendants' position from misrepresenting force-fed foie gras to the public. *See* Compl.

14   at ¶ 133. Regal Vegan will continue to have to combat misinformation about foie gras in any

15   event, but without Defendants' "Humane Choice" advertising, Regal Vegan will enjoy a much

16   improved position in the market for humanely produced paté.

17          Defendants are not the only ones making false and misleading statements about foie gras,

18   but as producers and sellers, they are in a unique position to influence consumer opinion. Because

19   of this, the relief requested in the complaint would go a long way towards redressing Plaintiffs'

20   injuries.

21          **III.     A finding of Article III standing for either Plaintiff is sufficient to deny**

22                 **Defendants' motion to dismiss for both Plaintiffs.**

23          While both Plaintiffs' theories of standing are sufficient to satisfy the requirements of

24   Article III, the Court may wholly deny Defendants' motion to dismiss once it finds that a single

25   Plaintiff has standing. "The general rule applicable to federal court suits with multiple plaintiffs is

26   that once the court determines that one of the plaintiffs has standing, it need not decide the

27   standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (citing *Carey v.*

28   *Population Services Int'l*, 431 U.S. 678, 682 (1977)). Should the Court determine that either

OPPOSITION TO MOION TO DISMISS
12-05809 WHA

1  Regal Vegan or ALDF has standing, then, it need not, as a matter of judicial efficiency, undergo a

2  full standing analysis for the other.

3      **IV.     Pursuant to the Court's standing order, Plaintiffs request oral argument by**

4              **an attorney with fewer than four years of experience.**

5      "If a written request for oral argument is filed before a ruling, stating that a lawyer of four

6  or fewer years out of law school will conduct the oral argument or at least the lion's share, then

7  the Court will hear oral argument, believing that young lawyers need more opportunities for

8  appearances than they usually receive." Supplemental Order to Order Setting Initial Case

9  Management Conference in Civil Cases Before Judge William Alsup at ¶ 9. John Melia, one of

10  the attorneys for Plaintiffs, has been out of law school for fewer than four years, and intends to

11  argue in opposition this motion on behalf of Plaintiffs. Decl. John Melia at ¶¶ 3-4. Plaintiffs ask

12  that the Court take this information into consideration in deciding whether to grant oral argument

13  on Defendants motion.

14                              **CONCLUSION**

15      Defendants' false advertising has caused injury to Plaintiffs, and it is within the power of

16  this Court to redress this injury. Plaintiffs therefore have satisfied all requirements for Article III

17  standing.

18

19  Dated: February 25, 2013                 NICOLE A. ROTH
                                             CARTER DILLARD
20                                           JOHN MELIA
                                             Animal Legal Defense Fund
21

22

23                                           _____
                                             /s/ John Melia
                                             JOHN MELIA
24                                           Attorneys for Plaintiffs

25

26

27

28

                                             OPPOSITION TO MOION TO DISMISS
                                             12-05809 WHA