NICOLE ROTH (CAL. BAR NO. 244919)
nroth@aldf.org
CARTER DILLARD (CAL. BAR NO. 20627)
cdillard@aldf.org
JOHN MELIA (CAL. BAR NO. 278323)
jmelia@aldf.org
ANIMAL LEGAL DEFENSE FUND
170 East Cotati Avenue
Cotati, CA 94931

Telephone:    +1-707-795-2533
Facsimile:    +1-707-795-7280

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, a non-profit corporation; REGAL VEGAN, INC., | Case No.  12-05809 WHA |
| Plaintiffs, | **REQUEST FOR JUDICIAL NOTICE** |
| v. | |
| HVFG, L.L.C. (d/b/a "Hudson Valley Foie Gras"), Marcus Henley, Michael Ginor, Izzy Yanay, and Richard Bishop, | |
| Defendants. | |

Plaintiffs request that the Court take judicial notice of the following case decisions from the National Advertising Division ("NAD") of the Better Business Bureau ("BBB"). A court may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006). Courts may consider facts by judicial notice on a 12(b)(6) motion to dismiss. *Dreiling v. Am. Express Co.*, 458 F.3d at 946 n.2.

These documents are available through NAD's website, http://case-report.bbb.org, and thus are capable of ready determination. Plaintiffs have also attached copies of the decisions. In addition, they are available from the source that produces and maintains the documents and thus their accuracy cannot reasonably be questioned. This court has taken judicial notice of agency orders and websites. *See e.g. Ting v. AT&T*, 182 F. Supp. 2d 902, 919 (N.D. Cal. 2002) (taking judicial notice of FCC orders); *Sullivan v. Lumber Liquidators, Inc.*, 2010 U.S. Dist. LEXIS 53989, 18-19 (N.D. Cal. 2010) (taking judicial notice of the contents of websites).

    1.  Foster Poultry Farms, Inc. (Chicken and Poultry Products), Case #4495, NAD Case Reports (05/12/06).

    2.  Perdue Farms Inc. (Perdue Poultry Food Products), Case #5295, NAD Case Reports (03/02/11).

    3.  D'Artagnan, Inc. (Foie Gras), Case #4959, NAD Case Reports (01/16/09).

Dated: March 15, 2013

NICOLE A. ROTH
CARTER DILLARD
JOHN MELIA
Animal Legal Defense Fund


/s/ Nicole A. Roth
NICOLE A. ROTH
Attorneys for Plaintiffs

- 1 -

# EXHIBIT A

*Case #4495 (05/12/06)*
**FOSTER POULTRY FARMS, INC.**
**Chicken and Poultry Products**
*Advertising Agency:*     In-house
*Challenger:*             *East Bay Animal Advocates, Inc.*

- **The fact that a lawsuit may involve the same parties or the adjudication of issues related to the challenged advertising claims, does not deprive NAD of its jurisdiction or its mandate to ensure the truth and accuracy of advertising.**

**Basis of Inquiry:**  East Bay Animal Advocates ("EBAA") an animal advocacy organization, together with a consumer, challenged the truth and accuracy of certain advertising and marketing claims made by Foster Poultry Farms, Inc. ("Foster Farms") for its Foster Farms® brand chicken products.  The following claims, made in print media and featured on the Internet, were the subject of the challenge:

- "Foster Farms is absolutely committed to the humane treatment of all animals."

- "Keeping the chickens comfortable, clean and well treated is a priority for Foster Farms and ensures excellent health and development."

- "Over the years, we have developed a comprehensive series of Animal Care Best Management Practices requiring humane production and processing practices for both chickens and turkey."

- "We remain committed to animal welfare.  Foster Farms would like to assure consumers that its chickens are raised in large poultry barns (without cages) that allow the birds to move around."

**Challenger's Position:**    EBAA maintained that the claims made by Foster Farms, that the chickens it raises receive humane treatment and care are objective advertising claims that materially influence the purchasing decisions of an increasing number of consumers who are concerned with the treatment of animals raised for food.  The challenged claims, according to EBAA, reasonably suggest that chickens raised by Foster Farms are raised in sanitary conditions, ensured basic health, not subjected to prolonged pain and suffering, and provided with proper veterinary care.  EBAA argued that claims of humane treatment are not truthful as Foster Farms® brand chicken is produced under a set of conditions vastly different than what the term "humane" reasonably represents to consumers.[1]

According to EBAA, it conducted an investigation of Foster Farms' operations and obtained photographic evidence depicting chickens suffering from stunted growth, ammonia burns, high incidences of chick mortality, infection, hunger and other abnormalities.  The evidence, argued EBAA, did not depict "humane treatment." "comfortable, clean and well treated" chickens in "excellent health and development" as claimed by Foster Farms.  EBAA further maintained that

---

[1] EBAA provided several dictionary definitions of the word "humane" including the definition provided by Webster's Third International Dictionary which defines "humane" as "marked by compassion, sympathy, or consideration for other human beings or animals."

**FOSTER POULTRY FARMS, INC.**
**Chicken and Poultry Products**
**Page: 2**

scientific evidence supports its contention that the conditions for raising chickens were not humane. For example, certain reports prepared by The Humane Society of the United States and the non-profit organization Compassion Over Killing ("COK") revealed crowded and unhealthy conditions for chickens raised on broiler industry facilities. The claims of humane treatment, argued EBAA, are false and the actual level of care and treatment of chickens by Foster Farms is marked by disease, husbandry methods that induce prolonged pain and suffering and unsanitary living conditions. EBAA requested that the claims of "humane treatment" and claims that chickens are "comfortable, clean and well treated" and in "excellent health and development" be discontinued.

**Advertiser's Position:** Foster Farms argued that NAD should decline to exercise jurisdiction over the matter because the core matter is not an advertising dispute but rather an ethical dispute between an animal rights group and a poultry producer over what practices regarding animals are "humane." The advertiser maintained that its practices are humane but noted that the issue of "humane" treatment is ultimately a moral question and that "complaints regarding…questions of morality…are not with the NAD/CARU mandate."[2]

Foster Farms also noted that the issue of whether the poultry industry practices are "humane" is presently the subject of a lawsuit, *Levine v. Johanns*, Civ. No. 05-4764-MHP (N.D. Cal., filed Nov. 21, 2005). NAD procedures provide that NAD shall "administratively close the case file" upon learning that "the advertising claims complained of are…the subject of pending litigation."[3]

Foster Farms also noted that the challenger does dispute the advertiser's contention that "over the years, we have developed a comprehensive series of Animal Care Best Management Practices" but rather, relies on "evidence" in the form of photographs which, according to Foster Farms, were obtained through criminal trespass. Foster Farms noted that in a previous case decided by NAD, United Egg Producers, NAD had the benefit of consumer perception evidence as to what a certification mark communicated to consumers. Foster Farms argued that EBAA, on the other hand, offers only its own unsupported arguments as to whether consumers are likely to be misled by any of the challenged statements. Foster Farms argued that NAD should decline to exercise jurisdiction in this matter but explained that if it did not do so, then it would decline to substantively participate in the matter.

**DECISION:**

---

[2] *NAD Procedures* § 2.2B(vi).
[3] *NAD Procedures* § 2.2 B (i).

**FOSTER POULTRY FARMS, INC.**
**Chicken and Poultry Products**
**Page: 3**

As an initial matter, NAD considered Foster Farms' contention that NAD Procedures effectively deprive the advertising self-regulatory forum of jurisdiction over the challenged claims. NAD's jurisdiction is limited to its review of truth and accuracy of national advertising and not issues of morality.    NAD determined however, that the challenge centers on the interpretation and accuracy of objective statements made in advertising.  Specific claims of "humane" treatment and representations made in advertising regarding the health of animals and the development of husbandry practices represent are statements that are relied on by certain consumers in making purchasing decisions regarding animal products.  The truth and accuracy of such claims as well as issues concerning the interpretation of the statements by consumers are properly within the purview of the self-regulatory forum.[4]

NAD also reviewed the complaint in the pending litigation in District Court in California (*Levine v. Johanns*) and considered whether the litigation deprived NAD of jurisdiction over the matter. Under NAD Procedures, NAD is required to administratively close a case when it determines that "the advertising claims complained of…are the subject of pending litigation or an order by a court" or the "subject of a federal government agency consent decree or order."   NAD determined that the truth and accuracy of the challenged advertising claims were not the subject of the pending litigation.[5]   The fact that a lawsuit may involve the same parties or the adjudication of related issues does not deprive NAD of its jurisdiction or its mandate to ensure the truth and accuracy of advertising.

**CONCLUSION:**

NAD determined therefore, that the challenged advertising and issues raised by EBAA were properly within the purview of NAD.  Because the advertiser declined to participate in the self-regulatory process and elected not to provide a submission on the merits, NAD referred the matter to the Federal Trade Commission pursuant to Section  2.10 of *NAD Procedures* for the Commission's review.  (#4495 DGM, closed 05/12/2006)

---

[4] United Egg Producers, (Animal Care Certified Eggs),  NARB Panel #122, Case #4108, *NAD Case Reports.*
[5] The litigation concerned the actions of U.S. Department of Agriculture under the Humane Methods of Slaughter Act of 1958 (7 U.S. C. §§ 1901 et seq.) and not the advertising claims made by Foster Farms.  See also The Hoover Company (Wind Tunnel and Fusion Upright Vacuum Cleaners),  Case #4667, *NAD Case Reports* (April 2006).

# EXHIBIT B

*Case #5295          (03/02/11)*
**PERDUE FARMS INC.**
**Perdue Poultry Food Products**
*Challenger:          Animal Welfare Institute*

**Basis of Inquiry:**  Advertising and labeling claims made by Perdue Farms, Inc. ("Perdue") for its poultry products were challenged by Animal Welfare Institute ("AWI").  The challenged claims included the following:

- *"Humanely Raised"*

- *"Raised Cage Free"*

**Challenger's Position:**

*The "Humanely Raised" Claim*

According to the challenger, consumers understand this claim to mean that the advertiser's chickens are raised in a manner that is more humane than the standard practices within the poultry industry.  As support, the challenger provided survey evidence which, it contended, demonstrated that 70% of consumers believe that "Humanely Raised" means that the chickens were raised under a standard of care better than is typical in the industry.  According to AWI, the actual standard of care adhered to by the Perdue is derived from the National Chicken Council (NCC) and does not satisfy consumer expectations of humanity in animal care.  In support of its assertion that Perdue chickens are not humanely raised, AWI cited scientific research[1] and offered a comparison between the NCC standards and those of other certification programs that provide a high standard of welfare and humane treatment of chickens.

According to the challenger, the NCC standards utilized by Perdue are based on requests from food retailers within the industry and while they do minimize the harshest conditions of chicken rearing, they do not comport with consumer expectations of what constitutes "humane" conditions.  The challenger maintained that the conditions provided for the chickens include windowless sheds, wet litter or sawdust, dim lighting, crowded, indoor confinement, insufficient space for natural mobility and a rapid and unhealthy growth rate for the chickens.

For example, NCC guidelines require chicken producers to provide only 0.6-0.7 square feet of space per bird within the chicken's housing, a dense spacing that, according to AWI, prevents chickens from performing basic movements.  In contrast, other animal welfare certification programs require significantly more space for chickens, capping the maximum density at 5.25 pounds per square feet or 6 pounds per square feet.[2]  The challenger argued that this additional space provided by other programs allows for more typical chicken behavior, such as preening and the spreading of wings.  According to the challenger, other welfare certification programs also require farms to provide chickens access to natural lighting and access to outdoor space, conditions denied to chickens raised by Perdue.

The challenger asserted that that the U.S. Department of Agriculture ("USDA") "Process Verified" shield which appears on the packaging further misleads consumers about the standards

---

[1] The challenger submitted the statements of Dr. Michael Appleby, an animal welfare scientist and veterinarian Dr. Michael Fox.
[2] The challenger referred specifically to certification standards of *Food Alliance* and *Certified Humane*.

**PERDUE FARMS INC.**
**Perdue Poultry Food Products**
**Page: 2**

the advertiser uses in rearing and raising its broiler chickens.  It explained that the USDA
Process Verified Program ("PVP") is a voluntary marketing program, which allows a producer to
pay a fee and have their own processes verified for adherence, however, the USDA does not
participate in the development or review of the standards themselves.  The program merely
allows the Agricultural Marketing Service (AMS) of the USDA to audit the company's own
standards, and grants the advertiser the right to display the USDA "Process Verified" shield.
The shield however does not define "humanely raised" or serve as substantiation for the claim.

Although the advertiser represented that the claim "Humanely Raised" had been discontinued
prior to the NAD challenge, AWI noted that the claim continued to appear in connection with
Perdue's Harvestland brand, in both website advertising and on packaging.

*The "Raised Cage Free" Claim*

The challenger argued the advertiser's claim, raised "cage free" chickens is misleading because
broiler chickens are not in any standard, typical, industry or small-scale production system ever
raised in cages.  The challenger argued that although the claim is literally true, it confuses
consumers who do not understand the distinction between "cage free" as it appears on packages
of meat as opposed to cartons of eggs.  Because a packed cage system is typical for egg-laying
hens, a company that does not confine egg-laying chickens to cages is providing a condition of
treatment that is meaningful to the consumer.  However, argued the challenger, the claim of
"cage free" for broiler chickens implies that thee chickens are raised in conditions that go beyond
the norm.  The claim therefore exploits consumer's reliance on a meaningful and important
representation with respect to egg-laying chickens, by applying it to a situation where it is
basically rendered meaningless.

The challenger argued that consumer perception data, obtained from a Quick Query omnibus poll
conducted by Harris Interactive, demonstrated that the claim, "Cage Free" created confusion
about the difference in treatment the advertiser's chickens received.  According to the challenger,
the evidence showed that consumers believe that these chickens are treated more humanely and
that, moreover, "cage free" is an added benefit over any competitor who does not use this claim
on their packaging.  The challenger contended that the "cage free" claim creates the impression
of a benefit over other brands where none, in fact, exists.

**Advertiser's Position:**

*The "Humanely Raised" Claim*

The advertiser explained that although the "Humanely Raised" USDA Process Verified claim
was truthful and substantiated, it had discontinued the claim and removed it from all of its
Perdue branded products.[3]  Although the advertiser asserted the challenge should be
administratively closed, based on Section 2.2(B)(i)(d) of the *NAD procedures*, the advertiser also
provided evidence which, it maintained adequately substantiating its "Humanely Raised" claim.

---

[3] According to Perdue, AWI sought to broaden the initial challenge and subsequently raised the issue of the claims
made on Perdue's  Harvestland branded poultry products.

**PERDUE FARMS INC.**
**Perdue Poultry Food Products**
**Page: 3**

The advertiser explained it has instituted the Perdue Farms Poultry Welfare Program as a comprehensive program meant to address every stage of a chicken's life cycle. The Program is meant to create an environment where the advertiser's chickens are healthy, safe, and humanely treated. Moreover, the advertiser asserted the USDA *Process Verified* program is designed as verification that particular claims are defined and verified through a well-designed, well-implemented, and well-maintained process. The advertiser explained to qualify, it is necessary for the advertiser to demonstrate that the claims made are substantive, verifiable, and repeatable, as well as not deceptive.[4] The process includes regular audits by a third-party, to assure that the practices used are consistent with the claims made. The advertiser contended this verification process is evidence of the thorough and complete nature of their Perdue Farms Poultry Welfare Program, and sufficiently substantiates the "Humanely Raised" claim.

According to the advertiser, the USDA's Food and Safety and Inspection Service (FSIS) opinion on humane poultry treatment also supports the claim that the treatment of chickens within this program is qualified as "humane." The FSIS referenced the NCC Animal Welfare Guidelines and Audit Checklist in creating their recommendations for humane treatment. The advertiser contended this is evidence that its own systems, based in part on the NCC Guidelines, are considered humane by the USDA Process Verified Program as well as the USDA Food and Safety and Inspection Service.

The advertiser maintained that the AWI has mischaracterized the NCC guidelines and makes inaccurate assumptions about Perdue's husbandry practices. The advertiser explained its own Poultry Welfare Program is built off of the NCC guidelines, which define humane practices in the commercial poultry industry as recognized by the FSIS, as well as the USDA specifically referencing the Guidelines in defining humane handling of poultry. The advertiser maintained the NCC guidelines are merely the starting point for its own Welfare Program, and that Perdue goes above and beyond these Guidelines.[5] The advertiser asserted that its welfare program is the most extensive, comprehensive and well-documented program in any large or small scale chicken production.

Additionally, the advertiser noted that the PVP notification leads consumers to additional information beyond the information on the packaging, including at the USDA website for the PVP program, which relates to the advertiser's welfare program including its education, training and planning, hatching procedures, nutrition and feeding guidelines, comfort and shelter regulations, health care, catching and transporting and processing guidelines, and other information.

The advertiser asserted that the "humanely raised" claim is a purely monadic claim that conveys information about the advertiser's product, and does not compare the treatment of the advertiser's chickens to any other companies or farms within the industry.

---

[4] PVP 1001 Procedure, USDA Process Verified Program: Program Requirements § 2.4.3.2 (July 2009).
[5] The advertiser identified several treatment criteria where its own welfare program exceeded NCC guidelines including the monitoring of air quality, air temperature, use of third-party audits, training of employees and removal of sick birds.

**PERDUE FARMS INC.**
**Perdue Poultry Food Products**
**Page: 4**

The advertiser also argued that the surveys relied upon by the challenger are fatally flawed and are not reliable for any purpose.[6]   According to the advertiser, the flawed methodology used in this online survey is similar to that of a political push poll, where the questions are biased and intended to obtain a specific reaction.

_The "Raised Cage Free" Claim_

The advertiser maintained that the "Raised Cage Free" claim is truthful and, moreover, provides important information to consumers.  In testing the consumer perception of its brand, Perdue found that only 35 percent of the total respondents believed that the advertiser's poultry products are produced under cage-free conditions.  Accordingly, the claim "raised cage free" corrects misconceptions about an attribute that is of particular importance to consumers.

The advertiser again noted that the survey relied upon by the challenger for its assertion that the "Raised Cage Free" claim suggests that the chickens are treated "better" than other chickens is materially flawed and offers no reliable support for this interpretation of the claim. It maintained that the claim "Raised Cage Free" is a monadic claim about a product attribute and does not imply any comparison or convey information about any other product or company.[7]

During the course of the proceeding but subsequent to AWI's submissions to NAD, the advertiser notified NAD of a proposed class action lawsuit that had been filed against Perdue in the Superior Court of New Jersey.  The lawsuit, according to the advertiser, involved the same claims and issues that were the subject of AWI's challenge before NAD. The advertiser argued that the NAD matter should therefore be administratively closed in accordance with Section 2.2 B(i)(b) of the _NAD/NARB Procedures._

**DECISION:**

Section 2.2 B(i)(b) of the _NAD/NARB Procedures_ provides that "if, at the commencement or during the course of an advertising…the advertising claims complained of are… the subject of pending litigation or an order by a court," NAD shall advise the challenger that the complaint is no longer appropriate for formal investigation in this forum.

Perdue maintained that because the "pending litigation" concerns the same claims and issues that were the subject of AWI's challenge, NAD must administratively close the case.  NAD did not initially close the case because 1) it was unclear whether the lawsuit filed against Perdue constituted "pending litigation" within the meaning of _NAD Procedures,_[8] and 2) although the complaint alleged that the claim "humanely raised" was false and misleading, it did not include any allegations concerning the claim "raised caged free," a claim which was also the subject of AWI's challenge before NAD.

---

[6] The advertiser provided the statement of Philip Johnson, a survey expert.  Perdue's criticisms of the survey included the choice of universe, methodology and biased questions.
[7] Similar to the claims, "Vegetarian-fed" and "No Animal Byproducts," which are also truthful claims.
[8] At the time NAD was informed of the proposed class action lawsuit, the complaint had been filed with the Superior Court in New Jersey but had not been served upon the defendant.

**PERDUE FARMS INC.**
**Perdue Poultry Food Products**
**Page: 5**

NAD initially determined that the claim, "Raised Cage Free" was properly before NAD.   The advertiser maintained that the claims "Raised Cage Free" and "Humanely Raised" are inextricably linked because, within the context of the NAD challenge AWI argued that the "Raised Cage Free" *means* "Humanely Raised," "treated in a humane fashion," "treated more humanely," and/or treated with a "heightened degree of animal welfare." Accordingly, argued Perdue, if the pending litigation precludes NAD's review of the claim "Humanely Raised" it must also preclude review of the claim "Raised Cage Fee."

NAD did not agree.   The *NAD/NARB Procedures* require NAD to close the case when "the *advertising claims* complained of are … the subject of pending litigation or an order by a court (emphasis added).[9]   Quite simply, the claims "Humanely Raised" and "Raised Cage Free" are distinct claims.   Although the claims are related (both convey information about treatment of chickens) and may raise potentially overlapping issues, the two challenged claims appear in different contexts and on different packaging.   NAD is not required to administratively close cases whenever there may be overlapping issues in pending litigation.   The determining factor is whether the truth and accuracy of the specific *claims* before NAD is the subject of the pending litigation.[10]   However, NAD subsequently learned that an amended complaint had been served upon Perdue and contained allegations as to the truth and accuracy of both the "Humanely Raised" claim as well as the "Raised Cage Free."   NAD therefore closed the case pursuant to Section 2.2 B(i)(b) of the *NAD/NARB Procedures.*

NAD recognizes that the purpose of Section 2.2B(i)(b) (which requires the closing of cases where the advertising claims challenged are the subject of pending litigation) is to avoid multiple and potentially conflicting findings from more than one tribunal.   Such conflicting directives could be unduly burdensome for advertisers and create confusion for consumers.   However, NAD also recognized that advertising self-regulation is not intended only to resolve disputes between competitors (or between consumers and companies) but also to foster consumer confidence in advertising by upholding truth and accuracy in national advertising and in furtherance of that end, to provide guidance to industry.

In administratively closing the case, NAD makes no substantive determination as to the truth and accuracy of the challenged claims.   However, given the extensive time in which the matter was before NAD and the time and resources expended reviewing the evidence, NAD offers the following preliminary and procedural observations:

 First, NAD appreciated the advertiser's notification that the claim "Humanely Raised" had been permanently discontinued from its Perdue branded products.   However, because the claim appeared on Perdue's Harvestland brand product, in both website advertising and product packaging, the claim was not precluded by virtue of Section 2.2.(B)(i)(d) of *NAD/NARB Procedures.*[11]

---

[9] Section 2.2 B(i)(b) of the *NAD/NARB Procedures.*
[10] <u>Dyson, Inc.</u>, #4619, *NAD Case Reports* (2007). (NAD closed the case pursuant to Section 2.2 B (i)(b) as to those performance claims that were before the court in pending false advertising litigation.  The remaining claims, concerned product demonstrations, which, although conveyed messaging about product performance were not before the court.  The review of the product demonstrations was therefore were subject to NAD's discretion).
[11] Section 2.2(B)(i)(d) requires NAD to close the matter when the advertising claims complained of are "permanently withdrawn from use prior to the date of the complaint and NAD/CARU received the advertiser's

**PERDUE FARMS INC.**
**Perdue Poultry Food Products**
**Page: 6**

Second, the fact that Perdue participates in the USDA Process Verified Program and the product receives a USDA Process Verified shield does not deprive NAD of jurisdiction or, by itself, resolve the issue of whether challenged claims are substantiated. Although NAD does not review language on labels and packaging that is mandated by federal law or regulation, or is "the subject of a federal government agency consent decree or order"[12] NAD determined that the two challenged claims did not fall under this exclusion[13] but noted the evidence concerning the USDA program and the Perdue Farms Poultry Welfare Program, the nature of third party-audits and the standard of care and treatment of Perdue's chickens are, of course, relevant to the issue of whether the "humane raised" claim is truthful and accurate. NAD further observed that that the claim "raised cage free," although expressly truthful, may nevertheless communicate implied messaging about the condition and/or treatment of its chickens. Advertisers are responsible for substantiating not only express claims but also implied messages reasonably conveyed by their advertising. Whether the evidence constitutes a reasonable basis to support messages communicated by the claims "humanely raised" and "raised cage free," is an appropriate issue for advertising self-regulation.

Finally, NAD recognizes that the ethical question of what constitutes "humane" treatment animals is not an issue to be determined by the advertising industry's self-regulatory body. However, consumer perception and understanding of "humane" treatment or "raised humanely" is directly relevant to the issue of whether such claims are substantiated or misleading to consumers.[14] Accordingly, the role of advertising self-regulation is appropriate to ensure that such claims are truthful and accurate.

For the foregoing reasons, NAD administratively closed the case pursuant to *NAD/NARB Procedures* § 2.2 B(i)(b) due to the pending litigation, but noted for the record its willingness to reopen the case, upon the request of either party, should the court fail to reach a final determination on the truthfulness and accuracy of the challenged claims. **(#5295 DGM, administratively closed 03/02/2011)**

© 2011. Council of Better Business Bureaus, Inc.

---

assurance, in writing, that the representation(s) at issue will not be sued by the advertiser in any future advertising for the product or service"

[12] *NAD/NARB Procedures* Section 2.2(B)(i)(c).

[13] Pfizer inc. (Revolution Tropical Parasiticide), NARB Panel #110 (April 2001). "The case-by-case review of claims by agency staff is not the sort of government action that NARC determined should defeat NAD jurisdiction." *See also*, Perdue Farms Incorporated (Perdue Short Cuts), Case Report #4576, *NAD/CARU Case Reports*, (October 2006).

[14] United Egg Producers, Inc. Case Report #4108, *NAD/CARU Case Reports* (Nov. 2003)/NARB Panel No. 122 (Apr. 2004).

# EXHIBIT C

**D'ARTAGNAN, INC.**
**Foie Gras**
*Advertising Agency:*          *Unknown*
*Challenger:*                  *Humane Society of the United States*
*Product Type:*                *Food/Beverage*
*Issues:*                      *Health Claims, Implied Claims*
*Disposition:*

- **When an advertiser establishes a reasonable basis for its claims, the burden shifts to the challenger to show either that there was a material flaw in the advertiser's evidence or that it has more reliable evidence demonstrating a different result.**

**Basis of Inquiry:** Internet advertising made by the specialty food purveyor D'Artagnan, Inc. ("the advertiser") for its foie gras was challenged by the Human Society of the United States ("challenger" or "HSUS"), a nonprofit organization whose stated mission is to protect domestic and wild animals. The challenger argued that the advertiser makes false and misleading claims about the degree of care provided for the ducks and geese, used for foie gras production.

The following claims formed the basis of this inquiry:

> Express Claims:
>
> - "The liver is not diseased, simply enlarged."
>
> - "Animals are hand-raised with tender care under the strictest of animal care standards."
>
> Implied Claims:
>
> - Artisan Duck Foie Gras is not produced by force feeding.
>
> - Artisan Duck Foie Gras is produced by healthy animals.
>
> - Artisan Duck Foie Gras is produced humanely.

**Challenger's Position:**

*Claim that the liver "is not diseased"*

Foie Gras is a food product made from the liver of a duck or goose that has been specially fattened for that purpose.  The challenger argued that website claims that the ducks' liver is "not diseased" but simply enlarged are false because the production of foie gras, by definition, results in a diseased liver.  Foie gras is produced by force-feeding ducks and geese, causing the birds to gain seven pounds in about 2 weeks.  During this process, the

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 2 of 10

livers of the birds grow 6 to 10 times their normal weight. The challenger explained that the force-feeding process changes the biochemical composition of the liver, resulting in impaired hepatic function, a pathological condition that is characterized by the presence of abnormally large quantities of fat within the organ's cells.

The challenger contended that three foie gras products purchased from D'Artagnan were tested by Dr. Robert E. Schmidt, a board certified veterinary pathologist. According to Dr. Schmidt, the samples "showed abnormal hepatocytes (liver cells), representing a pathological condition, which would impair cellular functions, and which in turn can lead to clinical illness." Furthermore, Dr. Schmidt noted that this condition of the liver may be accompanied by various clinical signs, and that hepatic enlargement in humans is painful.[1]

In response to the advertiser's contention that foie gras is not on the Department of Agriculture's Food Safety and Inspection Service ("FSIS") list of adulterated food, the challenger noted that this list is based on inspection at the slaughterhouse. The FSIS list is not intended to serve as measure of the health of animals while being raised on farms.

*Claims of animal care standards*

The challenger argued that the claim "Animals are hand-raised with tender care under the strictest of animal care standards" is misleading. According to the challenger, undercover investigations have revealed evidence of inhumane conditions at Sonoma Foie Gras, a foie gras farm that supplies D'Artagnan.[2] The challenger maintained that the evidence of the actual care of the animals would not meet a reasonable consumer's interpretation of the advertiser's claim of "tender care" and "strictest of animal care standards."[3] The challenger also submitted a consumer perception survey that was conducted to evaluate consumer perception of the claims regarding the Artisan Duck Foie Gras product. According to the challenger, the survey revealed that 77% of respondents indicated that the phrase "hand-raised with tender care under the strictest of animal care standards" was important in their decision to purchase foie gras.

The challenger contended that the use of the advertiser's reference to animal care "standards" is misleading because it suggests that there are formal standards that must be followed. However, neither federal nor state governments regulate foie gras production.

*Implied Claims*

    *1. Force-feeding of birds*

---

[1] Dr. Holly Cheever, DVM, visited Hudson Valley Foie Gras in 1997 and observed that "what is produced by this production method is a diseased organ for human consumption.
[2] The challenger cited to findings published at http://www.banfoiegras.org and http://gourmetcruelty.com.
[3] *See* United Egg Producers, Inc. (Animal Care Certified Eggs), Report #4108, *NAD/CARU Case Reports* (November 2003).

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 3 of 10

The challenger argued that the advertising implies that the ducks used for Artisan foie gras are not force fed.  The challenger further maintains that the failure to disclose that the birds are being force fed constitutes an omission of material information. The force feeding process involves the insertion of a tube down each duck's esophagus to force the animal to ingest a certain amount of food, far more food than they would eat voluntarily over a period of two to four weeks.  During this time period the livers can grow 6 to 10 times their normal weight.   A tour of Sonoma Foie Gras, producers of Artisan foie gras revealed that birds are force fed twice a day for the final two weeks leading up to slaughter.[4] Further, the challenger maintained that its consumer perception survey indicates that a significant number of consumers took away the impression that the ducks were not force fed.[5]

   2.   *Health of the birds used for Artisan Duck Foie Gras production*

The challenger argued that the advertisements communicate the false message that the ducks raised for Artisan Duck Foie Gras are healthy animals.  According to the challenger, the ducks often suffered from injuries, illness and infection as well as liver disease and impaired liver function, which is induced by the force feeding process. According to a reporter who toured Sonoma Foie Gras in 2003:

> The ducks who had been force-fed twice a day for two weeks, their livers swelling from one-third of a pound to one and a half pounds, were so fat they moved little and panted.  The birds gained an average of seven pounds in two weeks.

The challenger also maintained that its consumer perception data showed the majority of consumers surveyed took away a message that the ducks were not fed in such a way that their livers would become diseased.   According to the challenger, the actual condition of the animals is inconsistent with both the express claim that the liver is not diseased and the implied claim that the birds used to produce foie gras are healthy animals.

   3.   *Artisan Duck Foie Gras is produced humanely.*

The challenger argued that the advertisement conveyed a false and misleading implied message that the ducks raised for Artisan Duck Foie Gras are treated humanely. The challenger presented consumer survey evidence that showed a significant number of consumers took away the message that the ducks were treated humanely. The challenger purported that the force-feeding process, inducement of liver disease, poor health, illness, injuries and infections are evidence that the ducks are not treated humanely.

---

[4] The challenger referenced an article from the New York Times, "Foie Gras Fracas: Haute Cuisine Meets the Duck Liberators" by Patricia Leigh Brown, September 24, 2003.
[5] According to the challenger, the survey results demonstrated that 83% of respondents did not believe that force feeding was consistent with ducks being "hand-raised with tender care under the strictest animal care standards."

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 4 of 10

According to a study conducted by the European Union Scientific Committee on Animal Health and Animal Welfare ("SCAHAW"), the force-feeding process is "detrimental to the welfare of the birds." The force-feeding process was reported to cause the ducks pain, distress, lameness, liver disease, increased mortality and interfered with the social behavior of the birds.[6]

The challenger maintained that its consumer survey revealed that a significant percentage of respondents believed that the challenged advertising communicates the message that the ducks are treated humanely. According to the challenger, the actual conditions of the birds, indicate that these claims are false and deceive consumers who are interested in making socially responsible market choices.

In response to the scientific studies submitted by the advertiser[7], the challenger observed that the advertiser has not produced any evidence whatsoever regarding the actual conditions used to produce its foie gras products. In contrast, the SCAHAW report submitted by the challenger is the most comprehensive, objective and reliable review of foie gras production utilizing both scientific data and observations of actual foie gras production condition.

**Advertiser's Position:**

The advertiser maintained that its advertising for Artisan foie gras is truthful, accurate and adequately substantiated. Foie gras is produced under the direct inspection of the Food Safety Inspection Service ("FSIS") of the U.S. Department of Agriculture ("USDA"). Based on this oversight, the food has been determined to be wholesome and not diseased. Furthermore, according to the advertiser, the American Veterinary Medical Association, has rejected charges that foie gras is not produced humanely.

As further support for its claims, the advertiser referred to a letter of an expert in liver pathology, Dr. Caldwell, as well as several scientific studies that purportedly examined the effects that foie gras production has on ducks demonstrating that the force feeding process cannot be directly linked to increased stress indicators in ducks. Dr. Caldwell concluded that the steatosis seen in the liver samples he examined did not represent a disease state.

Two of the submitted studies provided background information on indicators of stress in male mule ducks, the type of ducks most commonly raised for foie gras.[8] According to

---

[6] The challenger also observed that foie gras had been banned in two jurisdictions in the United States and in several nations.

[7] The advertiser's submission of scientific studies was in response to NAD's request for additional information.

[8] Fauer et al., (2003). *Fear and stress reactions in two species of duck and their hybrid.* Hormones and Behavior, Vol. 43, pp. 568-572; Noirault et al., (1998). *Corticosterone plasma concentration in male mule*

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 5 of 10

one study provided by the advertiser, force feeding could not be directly attributed to the increased stress and negative well-being of the animals.[9] The study found that although the first instance of physical treatment was perceived to be stressful, during the remainder of the experimental period the ducks showed no negative response to further physical treatment.[10] The study also attributed the higher level of corticosterone in force-fed ducks to a rise in cholesterol associated with force-feeding and not to actual stress.[11] The study concluded that there was no evidence to support the hypotheses that repeated force-feeding causes acute or chronic stress in ducks.[12]

A study examining different responses between ducks and ganders to the force-feeding procedure indicated that while the force-feeding procedure is initially perceived as stressful, the ducks raised in collective pens subsequently adapt,[13] The study also found that the behavior of the ducks and geese indicate that they are not averse to the force-feeding procedure.[14] The ducks and geese continued to re-enter the feeding pens after having gone through the force-feeding procedure, and they remained active and did not indicate signs of passive coping or learned helplessness, which would have been indicators of frustration.[15] Finally, the study stated that ducks will naturally ingest spontaneously large amounts of food that are comparable to the amount they force-fed. The study found that the majority of ducks in individual cages never responded to force-feeding with an increase in corticosterone levels, a scientific measure of increased stress in animals.

**DECISION:**

As an initial matter, NAD recognizes that the current controversy surrounding the production and sale of foie gras invokes issues concerning animal welfare, veterinary science and ethics which remain, in large part, outside the scope of NAD's review. Advocates have maintained that the process of force-feeding ducks or geese to produce foie gras is inhumane and have sought to ban the production and sale of foie gras.[16] In response, producers of foie gras have defended their agricultural husbandry practices and argued that the controversy is the result of emotional appeal and unreasonable anthropomorphism on the part of animal rights advocates.

---

*ducks: effects of sampling sites, repeated samplings and ACTH injections.* British Poultry Science Ltd. Vol. 40, pp. 304-308.
[9] Guemene et al., (2001). *Force-feeding procedure and physiological indicators of stress in male mule ducks.* British Poultry Science, Vol. 42, pp. 650-657.
[10] *Id.* at 654-5.
[11] *Id.* at 655.
[12] *Id.*
[13] Guemene et al., (1999). *Physiological and behavioural responses to force-feeding procedure in male mule ducks and ganders.* 1st World Waterfowl Conference, Taichung, Taiwan, 1-4 Dec. Proc: 147-153.
[14] *Id.* at 4-5.
[15] *Id.* at 5
[16] For example, effective July 2012, the state of California will prohibit the "force feed[ing of] a bird for the purpose of enlarging the bird's liver beyond normal size" as well as the sale of products that are a result of this process. California Health & Safety Code. §§ 25980-25984. In 2006, the Chicago City Council voted to ban the sale of foie gras, a ban that was repealed in 2008.

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 6 of 10

NAD's mission is to ensure that the claims made in national advertising are truthful, non-misleading and adequately supported. NAD, as the advertising industry's self-regulatory unit, does not take a position on what constitutes humane treatment of animals or other ethical considerations associated with foie gras production. However, to the extent, an advertiser makes representations concerning animal welfare in its advertising, NAD considers the relevant scientific evidence, as well as consumer understanding and expectation, to ensure that such advertising is truthful and non-misleading. NAD appreciates that advertising messages concerning animal welfare convey information that may enable consumers to make purchasing decisions that reflect their particular social and ethical concerns.[17] Consumers cannot typically verify the accuracy of these claims for themselves. NAD, therefore, plays an important role in reviewing such claims to ensure that they are truthful, non-misleading and adequately substantiated.

*Claim that the liver "is not diseased"*

The advertiser's website provides that "the liver is not diseased, simply enlarged."

According to the challenger, the claim is false. The SCAHAW Report provides that "because normal liver function is seriously impaired in birds with the hypertrophied liver which occurs at the end of force feeding this level of steatosis *should be considered pathological"* (emphasis added). Additionally, Dr. Robert Schmidt, a veterinary pathologist, examined liver samples and concluded that livers are diseased. Other experts in the field of pathology and veterinary medicine, including Dr. Ward Stone, New York State Pathologist, New York State Department of Environmental Conservation, Dr. Greg J. Harrison[18] and Dr. Yvan Beck, have also concluded that the force feeding process results in hepatic steatosis (also known as hepatic lipidsosis) a pathology of the liver in ducks and geese.

The advertiser has maintained that the livers are not diseased, noting that the public agency responsible for ensuring that commercial meat and poultry are safe and unadulterated, the FSIS, has not determined that animals are diseased in any manner. The advertiser has also offered the opinion of an expert, Dr. Caldwell, an expert in liver pathology who concludes that the livers of ducks and geese that have been force fed are not diseased but rather are merely enlarged.[19]

It is a well-settled principle of advertising law that advertisers must be able to provide a reasonable basis for claims made in their advertising. When the claims relate to health or science, the advertiser's claims should be supported by "competent and reliable scientific

---

[17] Starbucks Corporation (Free Trade Certified Coffee), Report #4592, *NAD/CARU Case Reports* (November 2006).
[18] Dr. Harrison is a veterinarian and Diplomate of the American Board of Veterinary Practitioners specializing in avian medicine, and a Diplomate of the European College of Avian Medicine and Surgery.
[19] The challenger noted that Dr. Caldwell is a medical doctor, not a veterinarian or expert in animal welfare.

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 7 of 10

evidence."[20] The advertiser's basis for claiming that the liver is not diseased was the absence of any contrary finding by the FSIS and the opinion of certain experts that the enlargement of the liver in certain fowl is a natural process rather than a pathological one. In nature, the accumulation of fat in the liver allows birds to store energy for the demands of migration. The advertiser also maintained that because the birds are adapted for this purpose, hepatic steatosis is a reversible condition and is not associated with a shortened life span.

When an advertiser establishes a reasonable basis for its claims, the burden shifts to the challenger to show either that there was a material flaw in the advertiser's evidence or that it has more reliable evidence demonstrating a different result.[21] The challenger has produced substantial evidence, including the opinions of researchers and experts in the field of veterinary pathology and animal welfare, demonstrating that the force feeding of geese results in a diseased liver. The evidence included an analysis and the histologic findings of livers obtained from D'Artagnan, Inc. by Dr. Robert Schmidt, a veterinary pathologist as well as the findings of the European Union's Scientific Committee on Animal Health and Animal Welfare (SCAHAW). Although it is a natural process that allows certain species of ducks and geese to store excess fat in their liver, SCAHAW concludes that the level of hepatic steatosis (accumulation of triglyceride fat in liver cells) in force fed birds is "much more severe than any naturally occurring steatosis." Although the advertiser argued that steatosis is reversible, the challenger produced evidence that the condition of steatosis or lipidosis in force fed birds is part of a degenerative process leading to other health complications and higher mortality.[22] Moreover, the challenger contended, the fact that steatosis may be reversible does not mean that it is not pathological.

NAD also noted that oversight of a government agency (in this case, FSIS), does not relieve an advertiser of its obligation to substantiate health-related claims with competent and reliable scientific evidence.[23] The role of FSIS is to ensure that commercial beef and poultry products are unadulterated and safe for human consumption. The issue here is not whether foie gras liver is safe for human consumption. The particular advertising claims address the health of the animals, not the risk of adulterated food to humans. The fact that foie gras production has satisfied FSIS inspection requirements is not dispositive support for the specific advertising claims being made about the health of the animal and the welfare of the birds being raised foie gras farms. Similarly, the fact that the American Veterinary Medical Association has not taken an official position on foie gras production

---

[20] *See, e.g., Schering Corp.*, 118 F.T.C. 1030 (1994) (consent order); Basic Research Report #4008, *NAD Case* Reports (Feb. 2003).

[21] Mead Johnson & Company (Enfamil with Iron), Report #4019, *NAD/CARU Case Reports* (March 2003).

[22] SCAHAW's report notes that the mortality of force-fed birds is 10 to 20 times higher than for comparable breeding ducks ("the mortality rate in force fed birds varies from 2% to 4% in the two week force feedinb period compared with around .2% in comparable ducks.")

[23] See Perdue Farms Inc. (Perdue Short Cuts), #4576, *NAD Case Reports* (October 2006). ("While NAD endeavors to harmonize its decisions with applicable federal regulations and rulings, it must examine each case and weigh the intent behind the regulations and rulings and balance those against the reasonable expectations of consumer.")

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 8 of 10

does not mean that an advertiser has substantiated health claims pertaining to animal husbandry practices.

Although the advertiser claims a reasonable basis for claiming that the livers of the birds used to produce foie gras were not diseased, NAD determined that the challenger provided more extensive and persuasive scientific evidence of liver pathology. On the balance of the evidence in the record, NAD determined that the advertiser had not adequately substantiated its liver health claim ("the liver is not diseased, simply enlarged") and recommended that the claim be discontinued.

_Claims of animal care standards_

The advertiser's website claims that "Animals are hand-raised with tender care under the strictest of animal care standards."  According to the challenger, the advertiser's reference to animal care "standards" is misleading because it suggests that there are formal standards that must be followed when in fact neither the federal nor state governments regulate foie gras production.  Additionally, argued the challenger, the advertiser provided no evidence of the actual conditions under which the birds are raised. The challenger, on the other hand, maintained that the actual conditions on at least one foie gras farm, Sonoma Foie Gras, fall far short of the level of care conveyed in its website advertising.[24]

NAD agreed that the advertiser's claim that animals are raised "under the strictest of animal care standards" is potentially misleading because it suggests a particular and formalized standard of care that is adhered to.  In fact, the day-to-day animal husbandry practices for foie gras production are not the subject of government regulation or other independent oversight.  Thus, even if the animal husbandry practices associated with foie gras production reflect a greater level of care as compared to treatment of other animals on other farms, the claim of the "strictest animal care standards" has not been adequately substantiated.  The advertiser should be free to communicate truthful information on its website about way ducks are treated, but it should not promote a level of care that exceeds the actual conditions or, in any way, misleads consumers.[25]  NAD therefore recommended that the advertiser discontinue its claim that animals are hand-raised "under the strictest of animal care standards."

_Implied Claims_

In support of its contention that the challenged website advertising also communicated certain implied claims, the challenger submitted the results of a consumer perception

---

[24] According to the challenger, various undercover  investigations depict inhumane conditions and referenced images of injured and infirm ducks.
[25] United Egg Producers (Animal Care Certified Eggs), Report#4108,  _NAD/CARU Case Reports_ (November 2003).

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 9 of 10

survey.[26] Respondents were shown two pages of website advertising for Artisan Duck Foie Gras, first the home page and then a page that included the claim "Animals are hand-raised with tender care under the strictest of animal care standards." The survey utilized a "funneling" technique in which open-ended questions are followed in succession by more directed questions then additional closed-ended (multiple choice) questions.  For example, respondents were asked the following series of questions:

1.  Based on the information provided, what can you tell about the Artisan Duck Foie Gras?

2.  Based on the information provided, what can you tell about the way Artisan Duck Foie Gras ducks are raised?

3.  What does the marketer, D'Artagnan, mean when they say that the "Animals are hand-raised with tender care under the strictest of animal care standards?

These questions are followed by a series of multiple choice questions offering specific animal conditions (e.g., "the ducks are fed so much they can have difficulty walking) and exploring attitudes towards animal care and the purchasing of foie gras.  The survey report concludes that consumers believe that the claim "hand raised with tender care under the strictest of animal care standards" implies that the ducks are healthy and treated in a humane way, a message which, according to the challenger, is belied by the actual conditions, in particular, the force-feeding of ducks. According to the challenger, the survey supports its contention that the challenged advertising suggests that ducks raised for foie gras production are healthy, treated humanely and are not subjected to forced-feeding.

NAD has noted that, as a general rule, open-ended questions are more reliable than specifically directed questions or multiple choice questions as indicators of how consumers interpret messages communicated in advertising.[27]  Because the answers to open-ended questions do not necessarily yield all messages that are communicated, it is a common and acceptable practice, as a matter of survey methodology, to follow them with more directed questions provided they are not suggestive or leading questions that are likely to produce biased responses.[28]

NAD was concerned that the survey's closed-ended questions as well as the more directed questions (focusing on the "raising" of ducks) were flawed in that they were

---

[26] The survey was conducted by utilizing an online survey tool. Respondents were screened from a Zoomerang.com internet panel and consisted of individuals who knew what foie gras was and who had either bought foie gras who would consider buying foie gras from an internet marketer of the product.
[27] Schering-Plough Healthcare Products, Inc. (Lotrimin Ultra), Report #4678, *NAD Case Reports*, (June 2007).
[28] See Wm. Wrigley, Jr. Company, (Orbit, Extra, Eclipse Sugar-Free Gums), Report # 4855, *NAD Case Reports* (May 2008).

**D'ARTAGNAN, INC.**
**Foie Gras**
Page 10 of 10

likely to suggest particular answers.[29] Accordingly, NAD found the survey to be of only limited value in ascertaining the implied messages conveyed by the website advertising. Notwithstanding the limitations of the consumer survey, NAD has noted that the express language of the claim "hand raised with tender care under the strictest of animal care standards" was problematic for the reasons previously stated.  In particular, the reference to the "strictest standards of care" suggests a third-party standard that is rigidly adhered to.  Although the advertiser maintains that the its treatment of birds is humane and that there is insufficient evidence to conclude that the force-feeding process causes unhealthy stress in birds, NAD determined that the claim "hand-raised with tender care under the strictest of animal care standards" suggests a level of care and oversight that is not supported by the evidence provided by the advertiser and is inconsistent with the evidence in the record.

NAD does not take any position on whether the force-feeding process in ducks may be considered "humane" treatment.  The fundamental issues concerning animal welfare, ethics and public policy are controversial and understandably contentious.  However, to the extent an advertiser chooses to make specific representations and claims in their advertisements concerning the level of care, the health and welfare of animals raised on farms, the burden is on the advertiser to ensure that those claims are truthful, accurate and supported by competent and reliable scientific evidence.  Here, the advertiser did not satisfy its burden in the face of substantial evidence of liver pathology and the absence of particular animal husbandry standards.

**Conclusion:**  NAD recommended that the advertiser discontinue its claim about the liver health of birds used in Artisan foie gras production ("the liver is not diseased, simply enlarged") and the claim that animals are hand-raised with tender care "under the strictest of animal care standards" be discontinued.

**Advertiser's Statement:**      D'Artagnan strongly disagrees with NAD's decision but nonetheless will comply and modify its advertising.

---

[29] NAD was also concerned about the absence of a control and other filters for "noise".